991 F.2d 804
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marvin L. Wiseman, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
CENTER ART GALLERIES-HAWAII, INC., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William D. METT, Defendant-Appellant.
 Nos. 90-10612, 90-10616 and 90-10617.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 20, 1992.
Decided April 15, 1993.
As Amended on Denial of Rehearing Nov. 24, 1993.
 
 Before CANBY, REINHARDT and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 FACTS AND PROCEEDING
 
 2
 This criminal action concerns fraud in the sale of art attributed to the renowned 20th century Spanish artist Salvador Dali and to the American celebrities Anthony Quinn, Red Skelton, and Tony Curtis. Those convicted of mail and wire fraud in violation of 18 U.S.C. § 1341 and 1343 are Center Art Galleries-Hawaii, Inc. (Center Art), its president and majority stockholder, William D. Mett, and its vice-president and director, Marvin L. Wiseman. The defendants' appeals are consolidated. They challenge the sufficiency of the evidence as well as numerous rulings. We begin with the pretrial issues, proceed to the issues arising from trial, and conclude with a sentencing issue.
 
 Preindictment Delay
 
 3
 The defendants argue that extraordinary preindictment delay prejudiced their Fifth Amendment due process rights. "The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive preindictment delay." United States v. Sherlock, 962 F.2d 1349, 1353 (9th Cir.1992). However, "[t]he courts have traditionally granted the government a good deal of leeway in their decisions as to the timing of ... indictments." United States v. Mays, 549 F.2d 670, 678 (9th Cir.1977).
 
 
 4
 The defendants were indicted more than ten years after a State investigation of Center Art began. They argue the trial court erred because: (1) testimony at trial showed they were prejudiced by the deaths of Dali and Amiel in the interim, whose testimony "clearly would have been exculpatory," (2) trial testimony demonstrated that the witnesses' memories had dimmed, (3) the statute of limitations had run in certain of the mail and wire fraud counts, (4) the State of Hawaii and federal government investigations were really one and the same, and (5) the defendants could not be expected to depose witnesses before their indictment.
 
 
 5
 First, we have "emphasized that protection from lost testimony generally falls solely within the ambit of the statute of limitations." Moran, 759 F.2d at 782. The trial court correctly found that the five-year statute of limitations of 18 U.S.C. § 3282 was not exceeded. We have questioned whether "lost testimony would ever qualify for the level of prejudice necessary to establish a due process violation[.]" Id. Our reservation is especially true where the defendants' claims as to what Dali and Amiel would have said are purely speculative.
 
 
 6
 Second, the fact that "witness after witness testified that they could not recall precisely what was said five, eight and eleven years prior to trial" is not surprising and does not show how that lack of precision impaired the defendants' abilities to defend themselves. See Sherlock, 962 F.2d at 1354.
 
 
 7
 Third, the defendants list thirty-four counts that they claim are barred by the five-year statute of limitations because the superseding indictment was filed more than five years after the date of the indictment. However, the rule in this circuit is:
 
 
 8
 [W]here the counts of an original indictment are simply duplicated verbatim into a superseding indictment, the statute of limitations on those counts is tolled, even if additional counts that are subject to no limitations objections are added. This is because when charges from an original indictment are duplicated in a superseding indictment the defendant cannot claim he lacked notice of those charges.
 
 
 9
 United States v. Pacheco, 912 F.2d 297, 305 (9th Cir.1990) (citation omitted). The defendants do not contend that the counts at issue were not duplicated verbatim from the original indictment or that they lacked notice in any other manner. The original indictment was dismissed at the same time the motion to dismiss the superseding indictment was denied; thus, there was no time when tolling ceased. See United States v. Grady, 544 F.2d 598, 601 (2d Cir.1976) ("The statute begins to run again on those charges only if the indictment is dismissed, and the Government must then reindict ... in order not to be time-barred.").
 
 
 10
 Fourth, the "dual sovereign" doctrine forecloses the argument that the statute of limitations was exceeded. See United States v. Cordova, 537 F.2d 1073, 1076 (9th Cir.), cert. denied, 429 U.S. 960 (1976) (applies dual sovereignty doctrine directly to claims of Fifth Amendment violations). The state's delay and failure to indict cannot be charged to the federal prosecution, absent evidence of collusion. See id.
 
 
 11
 The trial court correctly evaluated whether there was actual prejudice to the defendants and whether the delay was caused by the government's culpability. See Sherlock, 962 F.2d at 1353-54. In the process of its evaluation, the trial court observed that the defendants were as capable as the government of preserving the testimony of Dali and Amiel. However, we have stated that "until the defendant is indicted or arrested, he has no reason to attempt to preserve the witness's testimony." Mays, 549 F.2d at 677 n. 12.[1] Nonetheless, the court properly refused to dismiss the indictment.
 
 The Grand Jury Proceedings
 
 12
 "[D]ismissal of the indictment is appropriate only 'if it is established that the [alleged] violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)).
 
 
 13
 The defendants argue that the grand jury's exposure to adverse publicity prejudiced their decision to indict. Courts generally will not dismiss an indictment on the basis of pre-indictment publicity. In Re Grand Jury of Southern Dist. of Ala., 508 F.Supp 1210, 1213 (S.D.Ala.1980) ("the settled law is that pre-indictment publicity is an inadequate grounds upon which to base the dismissal of an otherwise properly returned indictment"). In United States v. Finley, the Court was unable to find any case which dismissed an indictment on the basis of pre-indictment publicity. 705 F.Supp 1297, 1307 (N.D.Ill.1988).
 
 
 14
 The defendant bears the heavy burden of proving actual bias and prejudice. Id. The defendant cannot meet his burden merely by pointing to the existence of pre-indictment publicity or attempting to demonstrate that the grand jurors were exposed to such adverse publicity. Id. at 1308; In Re Grand Jury of Southern Dist. of Ala., 508 F.Supp. at 1214 ("The law does not require that grand juries be shielded from news reports.").
 
 
 15
 The defendants claim that certain exculpatory evidence was not presented to the grand jury. However, courts have no authority under their inherent supervisory powers to mandate that prosecutors present exculpatory evidence to the grand jury. United States v. Williams, 112 S.Ct. 1735, 1736 (1992).
 
 
 16
 The defendants criticize the prosecutor for presenting only three witnesses, two of whom were "summary" witnesses. However, summary witnesses are appropriate unless the record reveals misconduct with respect to their summaries. Bank of Nova Scotia, 487 U.S. at 260-61. No misconduct is evident.
 
 
 17
 The defendants argue that the government's expert, Peter Morse, presented "vicious and inflammatory" and false testimony before the grand jury. They claim that Morse's testimony was hearsay, "unreliable" and "provocative."
 
 
 18
 "An indictment based solely on hearsay evidence does not violate the Fifth Amendment." United States v. Samango, 607 F.2d 877, 880 n. 6 (9th Cir.1979); United States v. Chanen, 549 F.2d 1306, 1311 (9th Cir.) (rejects rule authorizing dismissal of indictments if hearsay alone is deliberately used when better evidence is available), cert. denied, 434 U.S. 825 (1977). Further, unreliable evidence is insufficient to require a dismissal of an indictment. Challenges either to the reliability or competence of the evidence will not be heard. Williams, 112 S.Ct. at 1746; Samango, 607 F.2d at 880 & n. 6 ("[A]n indictment cannot be attacked on the ground that evidence before the grand jury was incompetent or inadequate.")
 
 
 19
 We decided in Samango that, among other improprieties, conclusory statements by a witness as to the guilt of defendants biased a grand jury. 607 F.2d at 883-84. The question that arises from Morse's testimony is whether he unfairly biased the grand jury. Although the Supreme Court has never specifically held that the Constitution requires unbiased grand juries in federal prosecutions, United States v. Williams, 112 S.Ct. 1735 (1992); Beck v. Washington, 369 U.S. 541 (1962); Costello v. United States, 350 U.S. 359 (1956), the Court has stated that the Fifth Amendment "requires nothing more" than an "indictment returned by a legally constituted and unbiased grand jury." Costello, 350 U.S. at 363 (footnote omitted). We have dismissed an indictment where the prosecutor's cumulative errors prejudiced the defendants by "producing a biased grand jury." Samango, 607 F.2d at 884-885.
 
 
 20
 It is the grand jury's function "to assess whether there is adequate basis for bringing a criminal charge.... [T]o make the assessment it has always been thought sufficient to hear only the prosecutor's side." Williams, 112 S.Ct. at 1744 (citation omitted), cf. Samango, 607 F.2d 877. The trial court correctly found no evidence that the government knowingly had introduced any false testimony. Even though Morse expressed an opinion about the defendants' guilt, his statement does not show prosecutorial misconduct or prejudice.
 
 
 21
 In Samango, the witness who gave testimony was not familiar with the investigation; he reported events he did not observe; and he drew frequent conclusions concerning guilt. 607 F.2d at 883. The problem we described in Samango is not present here because, as the defendants admit, Morse was intimately involved in the investigation. Moreover, the cumulative errors in Samango produced the bias, not just the testimony of one witness. Samango, 607 F.2d at 884.
 
 
 22
 The fourth contention is that the prosecutor dumped over 1500 pages of transcripts from the original grand jury before the second grand jury with no indication that the transcripts were read before the latter jury voted to indict. The defendants rely on Samango, 607 F.2d at 881, to show impropriety. However, the reason for our concern in Samango was that "the transcript was an impressive repertory of insults and insinuations." Id. There is no similar accusation here. In Samango we concluded that the "cumulative effect" of several errors and indiscretions produced the bias. Id. at 884. Moreover, the grand jury here was not told the prosecutor had a deadline, as happened in Samango.
 
 
 23
 The defendants contend that Morse should not have informed the second grand jury that the first grand jury voted to indict. However, there is no evidence that this information resulted in a biased grand jury. The role of the grand jury is to find whether there is an adequate basis for bringing a criminal charge. Williams, 112 S.Ct. at 1744. We cannot assume there was an inadequate basis simply because one grand jury was informed about another grand jury's conclusion.
 
 
 24
 The defendants imply that the prosecutor was responsible for leaking information from the grand jury proceedings in violation of Fed.R.Crim.P. 6(e)(2). Even assuming that the prosecutor did so, this is not grounds for dismissing the indictment: "a knowing violation of Rule 6 may be punished as a contempt of court [rather than by dismissing the indictment]. See Fed.Rule Crim.Proc 6(e)(2)." Bank of Nova Scotia, 487 U.S. at 263.
 
 
 25
 The Use of Illegally Seized Evidence at Trial
 
 
 26
 The defendants claim that all of the Dali artwork was seized illegally and was introduced at trial to their prejudice. They claim there was no probable cause and the government search warrants lacked particularity.
 
 
 27
 The trial court correctly ruled that the warrants with the attached affidavit contain sufficient particularity as to the Dali artwork and that there was probable cause to seize it. Three tests determine whether a description is sufficiently precise: (1) whether probable cause exists to seize all items of a particular type; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those that are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986).
 
 
 28
 After careful review, we are satisfied that the warrant and affidavit meet these tests are met. Although ab ybattacgedm ybubciroirated affidavit may not be used to cure a warrant that is allegedly lacking in sufficient particularity, id. at 967, that fact has no bearing on the Magistrate Judge's use of the affidavit to determine whether there was probable cause. The affidavit sufficiently described fraud in the sale of the artwork of Salvador Dali to establish probable cause. Moreover, the discription in warrant of Dali artwork to be seized; i.e., "prints attributed to Salvador Dali; numbered, unnumbered, signed, unsigned;" and "other works of art attributed to Salvador Dali," is not too general or overboard. Out previous opinions regarding the particularity with which items listed in search warrants are to be discribed are concerned only with generic categories of items. See, e.g., Spilotro, 800 F.2d at 963; United States v. Cardwell, 680 F.2d 75, 78 (9th Cir. 1982). To describe Dali artwork is not to describe a generic item. The description is also sufficiently particular to prevent a "general, exploratory search[] and indiscriminate rummaging though a person's belongings." See Spilotro, 800 F.2d at 963.
 
 
 29
 Finally, to the extent the appellants argue the Dali art should have been more particularly described in the warrant given the discriptions in the affidavit, the government's probable cause was not limited to the evidence described in the Portmann affidavit. It could fairly be inferred that the episodes described in the affidavit were simply the "tip of the iceberg" with respect to fraud in the sale of Dali artwork. See United States v. Offices Known as 50 State Distributing Co., 708 F.2d 1371, 1375 (9th Cir. 1983) (citation ommitted), cert. denied, 465 U.S. 1021 (1984).
 
 
 30
 The defendants argue that no materials may be retained by the government under an unconstitutional general warrant "where one of the warrant's provisions, when examined independently, might be considered sufficiently specific." However, our rule is that "where invalid portions of a warrant may be stricken and the remaining portions held valid, seizures pursuant to the valid portions will be sustained." Spilotro, 800 F.2d at 967.
 
 
 31
 The defendants' final argument regarding the search warrant is that certain trial testimony revealed that false statements were made in the search warrant affidavit, thereby entitling them to a Franks hearing. See Franks v. Delaware, 438 U.S. 154 (1978). However, there is no indication the Franks issue was ever before the district court as part of the motion to suppress: the defendants rely on trial testimony in an attempt to establish falsity. We decline to decide this issue in the first instance. See United States v. Smith, 918 F.2d 1501, 1509 (11th Cir.1990) (request untimely where motion to suppress did not include a Franks request and defendant failed to meet the court's deadline for such a request), cert. denied, 112 S.Ct. 151 (1991); United States v. Mayomi, 873 F.2d 1049, 1056 n. 8 (7th Cir.1989) (because defendant failed to comply with procedural requirement that a Franks motion be filed, he waived the issue on appeal).
 
 Non-Expert Testimony on Dali's Signature
 
 32
 The defendants contend the trial court erred in admitting opinion testimony under Rule 701 as to the authenticity of Dali's signature from a lay witness, Robert Descharnes, a long-time associate of Dali. They state "Rule 701 does not permit a lay witness to express an opinion which requires ... the special skill and knowledge of an expert." They claim Descharnes' testimony as an "expert" was highly prejudicial.
 
 
 33
 The argument that Descharnes testified as if he were an expert is meritless. Defense counsel obtained Descharnes' admission that he was not an expert on handwriting. The court explained to the jury that Descharnes was testifying as a lay witness only. The defense asked Descharnes to describe "particular characteristics" of Dali's signature as if he were an expert.
 
 
 34
 "This court will not disturb a trial court's discretion in admitting lay-opinion testimony absent clear abuse." United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir.1988). The trial court did not clearly abuse its discretion in admitting Descharnes' lay opinion about the authenticity of Dali's signature. "A signature may be identified by testimony of a person familiar with the signature." United States v. Whittington, 783 F.2d 1210, 1215 (5th Cir.), cert. denied, 479 U.S. 882 (1986). The evidence was more than adequate to show that Descharnes was familiar with Dali's signature.
 
 
 35
 Rulings Regarding Expert Testimony on the Bas-Reliefs
 
 
 36
 The defendants argue the court erred by refusing to qualify Albert Field as an expert in Dali sculpture when he was called as a defense witness after he had testified for the prosecution.
 
 
 37
 "[T]he trial court has broad discretion to admit or exclude expert testimony." United States v. Aguon, 851 F.2d 1158, 1171 (9th Cir.1988). The decision to admit or exclude expert testimony is not disturbed on appeal unless it is manifestly erroneous. United States v. Patterson, 819 F.2d 1495, 1507 (9th Cir.1987). The court did not abuse its broad discretion. Although an expert in Dali prints, Field had not concentrated on Dali's sculpture; he did not consider himself an expert on Dali sculpture; and he had never studied art. Field's profession was teaching English. He was never compensated for his work as Dali's archivist. Therefore, while Field had a considerable knowledge of Dali prints, that knowledge did not extend to sculpture.
 
 
 38
 The defendants have numerous objections to the admission of the expert testimony of Fred Roster, a state university art teacher and sculptor. "The general test regarding the admissibility of expert testimony is whether the jury can receive "appreciable help" from such testimony." United States v. Gwaltney, 790 F.2d 1378, 1381 (9th Cir.1986), cert. denied, 479 U.S. 1104 (1987). There is no doubt that Roster's testimony could have "appreciably helped" the jury. Roster explained in detail the difference between the wax molds done by Salvador Dali and the finished product that was sold by the gallery as an original work of art. Without Roster's testimony, the jury might not have understood or possibly even detected the differences between the wax originals and the final product, or understood the production process for bas-reliefs.
 
 
 39
 Whether There Was Error in Admitting Evidence in Violation of Federal Rules of Criminal Procedure 802 and 403
 
 
 40
 The defendants claim hearsay was admitted in violation of Federal Rule of Evidence 802. They also claim unfairly prejudicial evidence was admitted in violation of Federal Rule of Evidence 403. The defendants cite to nine examples of alleged hearsay and/or unfairly prejudicial evidence that were admitted. Eight of the nine instances involved complaint letters sent to Center Art or to the Honolulu Office of Consumer Protection, some of which contained the hearsay statements or opinions of third parties.
 
 
 41
 We have approved the admission of letters from dissatisfied customers that were read to a jury. Phillips v. United States, 356 F.2d 297, 301-02 (9th Cir.1965), cert. denied, 384 U.S. 952 (1966). The admission was approved because the letters tended to show the "state of mind" of the defendants, which is an exception to the hearsay rule. See Fed.R.Evid. 803(3).
 
 
 42
 Because the court made it clear that the complaint letters and documents were admitted not to show their truth but rather to show the defendants' state of mind, we conclude the trial court did not abuse its discretion in admitting the letters. See United States v. Kirk, 844 F.2d 660, 663 (9th Cir.), cert. denied, 488 U.S. 890 (1988). The government had to prove, among other things, that the sale of the artwork as original constituted a scheme to defraud. The letters tended to show that defendants were engaged in an ongoing attempt to defraud. See Phillips, 356 F.2d at 301.
 
 
 43
 We also conclude that, in its rulings on admissibility, the court correctly weighed the letters' probative value as opposed to their prejudicial effect in accordance with Rule 403. See, e.g., Reporter's Transcript Vol. 20 at 141 (court states "There is no way you can keep out all hearsay.... It's only when it is so prejudicial that it outweighs any probative value that I'm compelled to keep it out under 403, and I don't find this to be the case here.").
 
 
 44
 The ninth witness, Janet Owsky, testified about telephone conversations with third parties. The record shows that this testimony was admitted not for its truth but to show why Owsky was unable to realize the investment value of her artwork. We find no abuse of discretion where the hearsay was admitted to show a course of action and where a limiting instruction was given. Moreover, the conversation is relevant. It tends to prove the difficulties the clients had in selling artwork that had been represented as original.
 
 
 45
 The defendants object to the admission of an appraisal by Albert Field. In his appraisal, Field states: "Dali has made an official public announcement that he signed no editions and no blank sheets after 1980." The defendants objected to the admission of this sentence on grounds of hearsay and prejudice. Although the objection was overruled at the time, five months later the Court ordered the sentence redacted. However, the defendants claim "the damage had long been done" by the time of the redaction.
 
 
 46
 There is no prejudice to the defendants. Mett's reply to Benzenberg states: "We do not accept as gospel Mr. Field's remarks, supposedly attributed to Dali, that he signed no editions after 1980." RT Vol. 9 at 66. This sentence conveys the full meaning of the redacted sentence to the jurors. The defendants themselves wished to leave Mett's statement in the record, stating that "Mr. Mett's letter does not repeat the particular prejudicial allegation." RT Vol. 9 at 84.
 
 
 47
 The defendants argue that a prior consistent statement of Denise Wheeler's should not have been admitted to rehabilitate her under Rule 801(d)(1)(B), since she had a motive to falsify before she made the statement. Her motive, according to the defendants, was her distrust of Center Art Gallery, which arose after her first answer to the 1987 questionnaire but before the June 1988 statement. The defendants' suggested motive is far-fetched. Where, as here, there is only a speculative motive to falsify, exclusion of the prior consistent statement is not appropriate. United States v. Miller, 874 F.2d 1255, 1275 (9th Cir.1989).
 
 
 48
 The defendants contend the trial court erroneously admitted testimony from former Center Art employees. The defendants protest that no connection was made between the employees' statements and Wiseman and Mett. They claim unfair prejudice. Citing to 1929 cases from another circuit, the defendants maintain that a defendant cannot be held responsible for the fraudulent statements of another. See Beck v. United States, 33 F.2d 107, 112 (8th Cir.1929); Barrett v. United States, 33 F.2d 115, 116 (8th Cir.1929).
 
 
 49
 The rule of Beck and Barrett does not apply where "there is adequate circumstantial evidence to show authorization due to the fact that the representations were substantially similar to those made by defendant." United States v. Vanderpool, 528 F.2d 1205, 1207-08 (4th Cir.1975) (footnote omitted), cert. denied, 424 U.S. 922 (1976). There was substantial evidence in the record that Mett and Wiseman authorized the statements of their employees.
 
 
 50
 Whether There Was Sufficient Evidence to Show the Defendants Misrepresented the Value of the Artwork
 
 
 51
 The defendants contend the indictment charged them with misrepresenting the value of the artwork by alleging that the "fair market value" of the artwork was significantly less than Center Art represented. They contend they made no representations about the fair market value as defined by the experts;[2] rather, they made representations in appraisals for insurance purposes. Therefore, they claim there was insufficient evidence of fraudulent misrepresentation. They also claim that an expression of opinion as to the artworks' value is not actionable as a false representation of material fact.
 
 
 52
 In reviewing the sufficiency of the evidence, "[t]he critical inquiry ... is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Thomas, 887 F.2d 1341, 1343 (9th Cir.1989) (internal quotations and citations omitted). A rational trier of fact could reasonably believe that Center Art's scheme was fraudulent because it failed "to measure up to the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.' " United States v. Buckley, 689 F.2d 893, 897 (9th Cir.1982), cert. denied, 460 U.S. 1086 (1983) (quoting United States v. Bohonus, 628 F.2d 1167, 1171 (9th Cir.), cert. denied, 447 U.S. 928 (1980)).
 
 
 53
 The defendants argue their statements of opinion could not constitute fraud. They state: "Here, where ... the appraisals were based on Center Art's most recent retail sales, the appraisal was a reasonably based opinion of the artwork's value."
 
 
 54
 "To prove fraud a plaintiff must establish that the defendant made false representations of material fact, intended to induce plaintiff to act, the representations were made with knowledge of, or reckless disregard for, their falsity, and the plaintiff justifiably relied upon those false representations to his detriment." Bulgo v. Munoz, 853 F.2d 710, 716 (9th Cir.1988). "[A]n actionable misrepresentation must relate to fact and cannot be based on an expression of opinion or a prediction." Id.
 
 
 55
 Viewing the evidence in the light most favorable to the government, a rational trier of fact could have concluded that the misrepresentations related to material facts. None of the consumers were sophisticated in art or its purchase. They did not know what characteristics to look for to determine whether the art was original, or whether it was likely that Dali personally supervised the production of the art, as Center Art represented. They did not know the characteristics to look for to determine whether their art was an original lithograph or a cheap photomechanical reproduction. The facts Center Art presented to clients were material to their purchases. Moreover, because there was evidence that the artwork was not authentic and that the defendants, who were extremely sophisticated in the art world, knew that it was not, the appraisals could not have been a reasonably based opinion of the artwork's value.
 
 The Definition of 'Original' Art
 
 56
 The defendants argue the government adopted an arbitrary definition of 'original' in the indictment. They maintain there was insufficient evidence to prove they were guilty of mail and wire fraud under the government's definition. They also claim they lacked notice that their conduct would violate the law because the Hawaii legislature has not restricted the term 'original' to the indictment's narrow definition.
 
 
 57
 The indictment's definition of 'original' is: "original lithograph" and "original etching" refer specifically to a lithograph or etching drawn by the hand of the artist to whom the work is ascribed." Supplemental Excerpt of Record at 15. The defendants contend "the government failed to prove that the defendants had ever utilized the term 'original' in accordance with the restrictive definition in the indictment or had intended that the word be understood ... by others to mean 'drawn by the hand of the artist.' " Center Art Opening Brief at 36. The record, however, contains evidence the defendants intended their clients to understand 'original' as the government defines it. We refer specifically to the contents of a booklet at Center Art depicting the gallery's logo titled "What Is An Original Print?" See RT Vol. IV at 120; Exh. 747E; RT Vol. IV at 122.
 
 
 58
 The booklet, available to Center Art clients,[3] contradicts the defendants' assertion that they did not intend others to understand that 'original' means 'drawn by the hand of the artist.' It contradicts their assertion that an original includes "the artist participat[ing] in the production of [photomechanically reproduced] products." The booklet states that such products "are not true original prints." Moreover, a document given to Center Art's salespeople distinguishes between originals and photomechanical reproductions. RT Vol. IV at 195-96.
 
 
 59
 The indictment alleges that Center Art "engage[d] in the marketing of purported original limited edition lithographs and etchings that were misrepresented as having been authored, produced and signed by Salvador Dali," Supplemental Excerpt of Record at 25, para. b, while in fact the lithographs and etchings were "photomechanical reproductions of some genuine and some fake Dali originals." Id. In this way, the defendants allegedly were able to sell art as an investment to unsuspecting clients at vastly inflated prices. The court instructed the jury that the government had to prove the allegations in the indictment. RT Vol. 50 at 184. The court also instructed on the defense of lack of intent to defraud. Id. at 185-86. The court instructed the jury that the intent to defraud "is a question of fact for you to determine like any other fact." Id. at 186-87.
 
 
 60
 The elements of mail fraud are: 1) a plan or scheme reasonably calculated to deceive; 2) the intent to defraud; and 3) the use of the mails to carry out the plan or scheme. United States v. Bonallo, 858 F.2d 1427, 1433 (9th Cir.1988). Viewing the evidence in the light most favorable to the prosecution, a rational juror, with evidence that certain artwork was represented as 'original' as defined in Center Art's promotional literature while in truth it was not, could find the defendants knew they were deceiving clients by selling photomechanical reproductions as originals. The defendants' argument that they had no notice their conduct was illegal also must fail.
 
 
 61
 The defendants argue that the Hawaii civil statute, H.R.S. Chapter 481F, effective July 1, 1986, did not prohibit defendants' use of the term 'original' to describe prints, the plates for which were created by someone other than the artist. While that may be true, a rational juror could still conclude the evidence showed the defendants misrepresented the artwork they sold. The art was highly priced for what it really was; it was sold as an investment; and there were appraisals that invariably showed substantial appreciation. On the other hand, there was no evidence the clients were told the art fit Hawaii's definition. Hawaii law is irrelevant to the misrepresentation charged under 18 U.S.C. §§ 1341 and 1343.
 
 
 62
 Whether the Court Erred by Failing to Compel the Production of Witness Interview Notes Taken by the Government
 
 
 63
 The defendants claim the court erred by refusing to require the prosecutor to produce his notes of interviews with trial witnesses pursuant to the Jencks Act, 18 U.S.C. § 3500(b). The defendants claim the trial court "summarily dismissed every request by defense counsel under 18 U.S.C. § 3500 for copies of those notes."[4]
 
 
 64
 A district court's denial of a motion to produce a witness' statement pursuant to the Jencks Act, 18 U.S.C. § 3500(b), is reviewed for an abuse of discretion. United States v. Augenblick, 393 U.S. 348, 355 (1969). A conviction will be affirmed if the "Jencks error is more than likely harmless." United States v. Wallace, 848 F.2d 1464, 1470 (9th Cir.1988).
 
 
 65
 The ruling the defendants challenge occurred very early in the trial in a hearing during the first witness's testimony. The defendants produced no evidence at the hearing nor did they offer any proof that any of the witnesses adopted the government's writings as their own or that anything was a substantially verbatim recital of what a witness said, as the Jencks Act requires. Further, their request to produce was premature. Section 3500(a) specifies that Jencks Act statements are to be produced only after direct examination of the witness. We have ruled that "[t]he Jencks Act prohibits a defendant from compelling the production of a prior statement of a government witness in the government's possession until 'said witness has testified on direct examination in the trial of the case.' 18 U.S.C. 3500(a)." United States v. Rewald, 889 F.2d 836, 865-66 (9th Cir.1989), amended on other grounds, 902 F.2d 18 (9th Cir.), cert. denied, 111 S.Ct. 64 (1990). The court did not abuse its discretion.
 
 
 66
 Whether the Prosecutor Made False Statements on Rebuttal That Denied Defendants a Fair Trial
 
 
 67
 The defendants argue that during rebuttal summation, the U.S. Attorney made material false representations. They claim they were unable to object because the Court admonished them not to make contemporaneous objections.[5] They claim the Court erred by not granting their motion for surrebutal and by rejecting their proposed supplemental instructions.
 
 
 68
 Whether to allow a jury to consider comments made in closing argument to which one party objects is reviewed for an abuse of discretion. United States v. Makhlonta, 790 F.2d 1400, 1403 (9th Cir.1986). Where there are no objections at trial, we review for plain error. United States v. Feldman, 853 F.2d 648, 652 (9th Cir.1988), cert. denied, 109 S.Ct. 1164 (1989).
 
 
 69
 The defendants claim the prosecutor distorted testimony by not accurately reading from the transcript what Leroy Olson said. While it is true the prosecutor misstated the record, sufficient corrective measures were taken.
 
 
 70
 The defendants say they argued in closing that Amiel was responsible for obtaining Dali's authorization and signature on the artworks once they were completed, not Center Art. They claim the prosecutor undercut this position with false statements. Because we cannot find the argument defendants claim they made in the record where they indicate it is to be found, we cannot evaluate it. We have "no obligation to mine the full record for [appellate] issues." See Schneider v. TRW, Inc., 938 F.2d 986, 990 n. 2 (9th Cir.1991) (citing Nilsson, Robbins, Dalgardn, Berlinger, Carson & Wurst v. Lousiana Hydrolec, 854 F.2d 1538, 1545 (9th Cir.1988) (per curiam)).
 
 
 71
 Moreover, while the prosecutor named the wrong painting when he stated there was correspondence to prove that Mett agreed to have paintings printed on Dali's presigned paper, there is evidence that Mett agreed to have other paintings printed on presigned paper, see RT Vol. 34 at 26; yet his staff understood that the prints were signed by Salvador Dali after the printing. RT Vol. 42 at 142. This evidence is indicative of the intent to deceive. The evidence showed that Center Art staff's misguided understanding was commensurate with the clients' understanding.
 
 
 72
 The defendants argue that the prosecutor "invented an inculpatory Eitingon letter, one that would prove his case." At issue is the interpretation of part of the letter.
 
 
 73
 "The prosecution is granted reasonable latitude to fashion closing arguments.... [P]rosecutors are free to argue reasonable inferences from the evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.1989), cert. denied, 495 U.S. 930 (1990). A reasonable inference from Eitingon's letter is that Dali was not to see the "Trojan Horse" sculpture because he might not approve of it. The prosecutor is not bound by a defendant's view of the evidence.
 
 
 74
 We review for an abuse of discretion a determination that rebuttal statements constitute permissible inferences. Id. Because the inference was permissible, the court did not abuse its discretion by denying surrebutal argument on this issue.
 
 In rebuttal, the government stated:
 
 75
 Now, Mr. Wing also put up for you a great big blowup of the small print on the bottom of the invoices that says: Absolutely no cash refund, merchandise credit only, and he says: How can there be a fraud when you tell people no cash refund, merchandise credit?
 
 
 76
 * * *
 
 
 77
 In addition, they gave out those invoices with the small print to some of the victims--people, of course, who bought them over the phone never saw them[.]
 
 
 78
 RT Vol. 50 at 138.
 
 
 79
 The defendants argue this statement means telephone customers never got copies of the invoice, which they say is refuted by the evidence. However, the prosecutor states he meant that no telephone purchasers would ever know, until they received the invoice in the mail after purchase, that there would be no cash refunds. The prosecutor's explanation of his statement is reasonable.
 
 
 80
 During rebuttal the prosecutor argued that a customer, Ann Armet, testified to having been told that Anthony Quinn "worked on the [serigraphs of his original] himself." RT Vol. 50 at 152. The defendants claim this alleged testimony was never heard, and that on cross-examination, Armet contradicted it in any case.
 
 
 81
 This claim is not borne out by the record. Moreover, the prosecution pointed out that the questionnaire had a number of repetitive questions that might have confused people who filled it out.
 
 
 82
 The defendants argue that Center Art never admitted "Lincoln in Dalivision" was a photomechanical reproduction, as the government argued. See RT Vol. 50 at 139. However, there was testimony from Dr. Elizabeth Harris of the Smithsonian Institution that the print for "Lincoln in Dalivision" was made using a commercial half-tone screen. In addition, Ms. Petranek was given a refund by Center Art for the print. These facts downplay any prejudice to the defendants from the government's misstatement, if any. Moreover, the jury was instructed beforehand that closing arguments do not constitute evidence. See RT Vol. 49 at 12.
 
 
 83
 To conclude, none of the prosecutor's statements are clearly prejudicial. There is no plain error in the court's denial of surrebutal.
 
 
 84
 Whether the District Court Properly Imposed Fines on Mett and Wiseman
 
 
 85
 Defendants Mett and Wiseman argue that the imposition of fines on them violated section 5E1.2(a) of the Sentencing Guidelines. They say the court found they were indigent and unlikely ever to pay the fines imposed. This argument is without merit. In imposing the sentences after hearing the evidence, the court found as follows:
 
 
 86
 This is a big case, it is at least a $5 million case, it could be as much as a $40 million case if the government had its opportunity to at least pose its theory. Just in the audit year of 1984 alone that disclosed sales well in excess of $1 million, and we're talking about 13 years, we're talking about a very viable company....
 
 
 87
 Id. at 122. It is clear the court found the defendants had the ability to pay the fine in the future. It is the defendants' burden to establish inability to pay or that they will unable to pay the fine in the future. United States v. Quan-Guerra, 929 F.2d 1425, 1427 (9th Cir.1991). They did not do so.
 
 CONCLUSION
 
 88
 For the reasons stated, all rulings of the trial court are AFFIRMED.
 
 REINHARDT, Circuit Judge, concurring:
 
 89
 I concur in the majority's affirmance of the defendants' convictions and in all parts of its disposition save the discussion of the definition of original art. The indictment defines an "original lithograph" as a lithograph drawn by the hand of the artist to whom the work is ascribed. An original etching is defined in a parallel fashion. The government argues and the majority concludes that the defendants adopted this definition. However, the government's definitions make little sense. As stated elsewhere in the indictment, lithographs and etching are not themselves drawn by the hand of the artist but rather based upon a plate or a stone that is. Whether or not a lithograph or an etching is "original" or otherwise, it is simply not drawn by the hand of the artist. Therefore, I doubt that the defendants defined "original art" as set forth in the indictment.
 
 
 90
 Nevertheless, I agree that the defendants' arguments that the convictions are fatally defective must fail. The government need not prove all the facts charged in an indictment--only enough facts to prove the essential elements of the crime. United States v. Jenkins, 785 F.2d 1387, 1392 (9th Cir.1986). Insofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be established at trial. Id. The essential elements of mail and wire fraud were alleged and proved. The indictment's definitions of original lithograph and etching are surplusage.
 
 
 91
 In essence the defendants argue that because of the misdefinition of "original" there was a fatal variance between the indictment and the charges of which they were convicted. A variance is fatal if the evidence presented at trial, together with the jury instructions, raises the possibility that a defendant was convicted of an offense other than that charged in the indictment. United States v. Wright, 932 F.2d 868, 874 (10th Cir.1991). In a mail or wire fraud prosecution the defendant is entitled to be put on notice of the essential nature of the fraudulent scheme alleged and it is that scheme that must be proven. See United States v. Pisani, 773 F.2d 397, 409-11 (2d Cir.1985). Here, the indictment meets that requirement. It charges in great detail that the defendants made multiple knowingly false representations regarding the art they sold in order to obtain a price substantially in excess of its true value. The jury instructions did not mention the term "original". Instead, they correctly defined the essential elements of the crimes with which the defendants are charged. The jury was specifically instructed that the defendants had to have made false, material representations and that they had to have known the falsity of those representations when they made them. The trial record is replete with false statements by the defendants or their agents regarding the value of the works of art and the participation of the artists in their creation.
 
 
 92
 In sum, the convictions must be affirmed because there is sufficient evidence from which a rational trier of fact could have found that the essential elements of the crimes with which the defendants were charged were proven beyond a reasonable doubt. Although there was an insubstantial variance between the indictment and what was proven at trial, the defendants were properly convicted of the fraudulent schemes of which the indictment put them on notice.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The case the trial court relied on, U.S. v. Alderdyce, 787 F.2d 1365, 1370 (9th Cir.1986), is inapposite. Alderdyce does not involve a preindictment delay, but rather a Brady violation in which the defense made a tactical decision not to investigate exculpatory information. 787 F.2d at 1370
 
 
 [2]
 According to the defendants, the experts defined "fair market value" as the price that could be realized through a sale at high level auction houses
 
 
 [3]
 The defendants argue the booklet had nothing to do with Center Art. However, a client testified he found the booklet at Center Art Gallery; that he read it; and that he understood it to be part of the information that Center Art was providing to him. A rational juror could find Center Art endorsed the booklet
 
 
 [4]
 The court ruled that the notes were not obtainable because Osborne was an attorney working on the case. However, "a writing prepared by a Government lawyer relating to the subject matter of the testimony of a Government witness that has been 'signed or otherwise adopted or approved' by the Government witness is producible under the Jencks Act, and is not rendered nonproducible because a Government lawyer interviews the witness and writes the 'statement.' " Goldberg v. United States, 425 U.S. 94, 98 (1976)
 
 
 [5]
 The record plainly shows the Court did not preclude objections. See RT Vol. 49 at 9-10